UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                    06 Cr. 273 (RPP)

          -   against -
                                              **OPINION AND ORDER**

MANUEL SUAREZ, ET AL.

                                    Defendant.
------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

        Defendant Manuel Suarez ("Defendant") moves to suppress statements made to

officers after his arrest.  (Notice of Motion, dated June 29, 2006.)  As grounds for the

suppression, Defendant claims that (1) the arresting officers did not have probable cause

to arrest him; and (2) the arresting officers did not inform him that he had the right to an

attorney and the right to remain silent before they questioned him around 10 A.M. on

March 6, 2006.  (Affidavit of Manuel Suarez, sworn to June 8, 2006 ("Def.'s Aff.") ¶

12.)  For the reasons that follow, Defendant's motion is denied.[1]


                             **DISCUSSION**

        **A. Probable Cause for Arrest**

         "Probable cause to arrest exists where the facts and circumstances are sufficient

'to warrant a person of reasonable caution in the belief that (1) an offense has been or is

---

[1] On March 23, 2006, a three count indictment charged Defendant with: (1) conspiracy to violate narcotics
laws in violation of 21 U.S.C. § 846; (2) possession with intent to distribute approximately 866 grams of
heroin in violation of 21 U.S.C. § 841(a)(1); and (3) possession of a firearm in connection with drug
trafficking , a crime of violence, in violation of 18 U.S.C. § 924(c).

being committed (2) by the person to be arrested.'" Rothstein v. Carriere, 373 F.3d 275, 292 (2d Cir. 2004) (quoting United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983)).

At a hearing held on September 18, 2006, Agent Gillespie of the Drug Enforcement Agency (DEA) testified that from the beginning of February 2006,  he was an active participant in a DEA investigation in conjunction with the Hudson County Prosecutor's office, and the Hoboken Police Department.  (Transcript dated September 18, 2006 ("9/18 Tr.") at 4.)[2]  Investigators conducted court ordered wiretapping on the telephones of Defendant's co-defendants, Praylow, Garcia and Gonzalez, and identified Defendant as a person heard in over 100 calls.  (Id. at 5-6.)  In these telephone calls, a participant identified himself as "Murder" and was referred to as "Murder" by those speaking to him.  (Id. at 7, 8.)  Agent Gillespie testified that he had personally listened to approximately 25 calls in which he had heard "Murder" speaking.  (Id. at 35.)

Based on the intercepted information, the investigators set up surveillance in places where "Murder" planned to meet various co-conspirators: "[t]hey said that they were going to meet at a certain location.  We were able to observe that meeting . . . based on information that we received from wiretaps. . . and we would observe Manuel Suarez at that location at a certain time."  (Id. at 7-8.)  Defendant's location or action would match with those that were discussed as relating to "Murder" or "C Murder" on the intercepted phones. (Id.)  As a result, investigators concluded that Defendant, of whom they had a "prior arrest photo," (id. at 41), was the person known as Murder.  (Id. at 8.)[3]

---

[2] The hearing on the motion was held on September 18, 2006 and September 26, 2006.  The transcripts are referred to herein as "9/18 Tr." and "9/28 Tr."
[3] When he was arrested, Defendant was in possession of two cellular telephones that "Murder" had used to make calls to his co-defendants.  One of the phones displayed Defendant's picture, and the word "C Murder" on its face.  (9/18 Tr. 8-9.)

During early telephone intercepts, there were numerous "pertinent" calls, in which Defendant was an alleged participant, identifiable as conversations consistent with "drug trafficking activities, distribution as well as collecting money for the organization."  (Id. at 10.)  Although the speakers used coded language, referring to bricks of heroin as "CDs," the surveilling agents observed the suspects distributing what they believed were "bricks of heroin."  (Id. at 11.)  Agent Gillespie testified that he concluded these conversations pertained to narcotics due to "observations based on the [investigation] as well as [his] experience and training from listening to intercepts."  (Id. at 11.)  During some of the surveillances, Agent Gillespie personally witnessed several of the defendants, including Mr. Suarez, distributing "bricks of heroin."  (Id.)

Agent Gillespie testified that on March 5, 2006, the day before the arrest, "[t]here were a series of telephone calls throughout the day regarding money pick-ups, that they were collecting money for the organization."  (9/18 Tr. at 13; see also Affidavit of Police Officer William Downey, dated March 6, 2006 ("Downey Aff."), attached to Defendant's Memorandum of law, dated June 29, 2006, as Ex. A. at ¶ 5.)  As these calls were "intercepted [by agents working] in the wire room, that information was immediately . . . transmitted to [the surveilling officers.]"  (9/18 Tr. at 45.)  Next, there were a series of calls between Defendant Johnny Garcia (who was in Florida) and Rory Praylow, in which Praylow was instructed to go to New York City to pick up an amount of heroin.  (Id. at 13.)  In another call, Praylow told Garcia that he was with Gonzalez and Suarez, headed to Manhattan.  (Id. at 14.)  During this conversation, Suarez got on the phone and informed Garcia that they would meet at the same spot as last time, 211 and Broadway. (Id. at 15.)  Later, close to midnight, Suarez, using his phone, was instructed, by Praylow,

to get in the car with the drug supplier and not to look around. (<u>Id.</u>)[4]  Another call to

Garcia confirmed that they had picked up the drugs, but were uncertain about the amount.

(<u>Id.</u> at 17.)  In a later call, Praylow told Garcia that they had picked up the "whole five."[5]

(<u>Id.</u>)

      Agent Gillespie testified that subsequent calls revealed that "[the defendants]

were going to meet at a Hess gas station in Hoboken, New Jersey."  (<u>Id.</u> at 19 ("There

was a series of calls that Suarez, Gonzalez and Praylow were en route to the Hess Gas

station.  Numerous people were calling [asking] . . . are you on your way[?]  It looked

like numerous people were waiting on their arrival.").)  As a result, "[he and officers]

established surveillance in the vicinity of the Hess gas station."  (<u>Id.</u> at 18.)  Though

Agent Gillespie stated that he was not positioned with a view of the station, other officers

were.  (<u>Id.</u> at 21.)  Using "point-to-point radios," (<u>id.</u> at 19), these officers "put [the

information] over the radio so that [the rest of the officers] could be given a clear picture

as to what was going on."  (<u>Id.</u> at 21.)

      At around midnight on March 6, 2006, officers, including Agent Gillespie,

observed several "high-end vehicles" park along side the gas station; no one in the

vehicles used the gas pumps.  (<u>Id.</u> at 19-20, 48.)   Later, a maroon Lincoln Navigator

arrived; officers identified Defendant as the driver of the car, and two co-defendants as

passengers.  (<u>Id.</u> at 21.)  Once the Lincoln Navigator was parked, one of the co-

defendants, Gonzalez, "exited the rear of the vehicle and went around to the tailgate

---

[4] Agent Gillespie later testified that he was not certain whether Suarez was to get into the car with the
heroin supplier or vice versa.  (<u>See</u> 9/18 Tr. at 46 (QUESTION: Isn't it true that . . . in fact Praylow told
Mr. Suarez to have the source of the heroin get in the car with him?"  ANSWER: That could possibly be
the way.).)

[5] In an earlier call it was confirmed that "the whole five" meant the "entire amount of heroin."  (9/18 Tr.
17.)

section and opened up the tailgate."  (Id.)  Believing that the suspects were about to

conduct a drug deal, officers "arrested all of the individuals" on the scene.  (Id. at 22.)  A

search warrant, obtained the following morning,  resulted in the discovery of "four

handguns and 100 bricks of heroin . . . [i]nside a hidden compartment" of the Lincoln

Navigator.  (Id. at 22-23.)

 At the hearing, the Defense argued that the evidence had not shown that Agent

Gillespie ever personally conducted surveillance to confirm that "Murder" was in fact the

Defendant, and did not personally identify the Defendant driving the Lincoln Navigator

before his arrest.  Defense counsel claimed that by not calling witnesses to those events,

the Government has not provided evidence of probable cause for arrest because the

defense could not cross examine those witnesses.

 However, the testimony of Agent Gillespie provided sufficient information for the

Court to determine that there was probable cause for the arrest.  (See id. at 69.)  It was not

necessary for Agent Gillespie to identify "Murder," as the defendant, or to identify

Defendant as the driver of the Lincoln, for the officers to have had probable cause to

arrest the defendant.  Prior to the arrest, the telephone intercepts of calls between

Praylow, Garcia and Gonzalez made sufficiently clear that there was a high likelihood

that a purchase of drugs had occurred in Manhattan, and that a distribution of drugs, to

persons who were calling Praylow and Gonzalez, was about to occur at the Hess gas

station  The gathering of vehicles next to the Hess station and the arrival of the Lincoln

Navigator across the street around midnight with Praylow, Gonzalez and the Defendant

as occupants and Gonzalez's conduct thereafter were adequate grounds to arrest the

occupants of the Lincoln Navigator. Thus, the intercepts transmitted to Agent Gillespie,

and the other officers, together with their joint surveillance, created probable cause for him and the other officers on the scene to conclude that the occupants of the vehicle, Praylow, Gonzalez, and Defendant, were engaged in an attempt to distribute drugs at the Hess station.

Although Agent Gillespie did not personally identify the defendant as "Murder" and did not personally observe the defendant in the Lincoln Navigator at the time of the arrest, those observations were not necessary for the officers to have probable cause for the arrest.  As telephone intercepts were picked up by officers in the wire room, that information was immediately transmitted to officers on the scene.  (Id. at 45.)  Thus, Agent Gillespie was kept abreast of the events by officers with a direct line of sight.  (See id. at 19 (QUESTION: Were you and the other agents able to communicate with each [other] instantly? ANSWER: Yes we were . . . via our radios.).)  The evidence introduced by the Government establishes that there was probable cause for the arrest of the Defendant.  See United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001) ("[A]n arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."); Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989) ("[W]here law enforcement authorities are collaborating in an investigation . . . the knowledge of one is presumed shared by all." (quoting Illinois v. Andreas, 463 U.S. 765, 772 n. 5 (1982)).).

6

**B. Miranda Claims**

Defendant has two *Miranda* related claims.  First, he claims that Detective Miller's failure to advise him of his rights orally rendered the warning inadequate.  Second, he claims that any statements he made after he invoked his right to silence should be suppressed.

**1. Adequacy of Miranda Warning**

In the affidavit in support of his motion to suppress, Defendant claimed that "[officers] . . .  told me that I had a right to remain silent and a right to have counsel present during questioning" only "after they had questioned me." (Def.'s Aff. ¶ 12.)  At the hearing on September 18, 2006, the Government introduced an advice of rights form, containing Defendant's signature; when introduced at the hearing, the form was dated March 6, 2006 at 5:10 AM.  (See Gov't. Ex. 1.[6])  Agent Gillespie also testified that when he saw the form at 5:30 AM on March 6, it looked the same as it did at the hearing, but that he "did not see [Defendant] read or sign [the] form."  (9/18 Tr. at 25.)  At the hearing on September 28, 2006, Detective Dennis Miller, of the Hudson County Prosecutor's Office, testified that he was present when Defendant signed the form.  (9/28 Tr. at 82.)   Defendant no longer contends that he was not advised of his rights. (Def.'s 10/12 Mem. 4.)

---

[6] The Form listed Defendant's rights, in both English and Spanish, in the following fashion:
 1.  YOU HAVE THE RIGHT TO REMAIN SILENT.
 2.  ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT OF LAW.
 3.  YOU HAVE THE RIGHT TO TALK TO A LAWYER AND HAVE HIM PRESENT WITH YOU DURING ANY QUESTIONING.
 4.  IF YOU CANNOT AFFORD TO HIRE A LAWYER ONE WILL BE APPOINTED TO REPRESENT YOU BEFORE ANY QUESTIONING, IF YOU WISH ONE.
 5.  I HAVE READ MY RIGHTS AND UNDERSTAND SAME.

He now claims that he was not advised of his rights orally, and that the use of a written advice of rights form was insufficient warning. (Id.)

The government must establish by a preponderance of the evidence that a defendant was advised of his *Miranda* rights, and that the defendant both understood those rights and validly waived them before being questioned.  Colorado v. Connelly, 479 U.S. 157, 168-69 (1986); United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995).  The Second Circuit has not squarely addressed whether a written warning is adequate, though it has said "[w]e review the warnings not for whether they adhered to a certain form, but for their substance.  We must ascertain if [a defendant] had his Miranda rights brought home to him in an intelligible fashion." United States v. Anderson, 929 F.2d 96, 98 (2d Cir. 1991).  Several other circuits have addressed whether advising a suspect of his rights only in writing is adequate, and they have uniformly decided that it is sufficient.  See United States v. Sledge, 546 F.2d 1120 (4th Cir 1977); United States v. Coleman, 524 F.2d 593 (10th Cir. 1975); United States v. Alexander, 441 F.2d 403 (3rd Cir. 1971); United States v. Van Dusen, 431 F.2d 1278 (1st Cir. 1970); United States v. Osterburg, 423 F.2d 704 (9th Cir. 1970).

Here, the record shows that Defendant understood his rights.  Detective Miller did not simply put the form in front of Defendant and ask him to sign.  He first asked Defendant if he could read the form, and offered to read the form to him if he was unable to read it himself.  (9/28 Tr. at 81.)  Detective Miller also instructed Defendant to put a check mark next to each of the five paragraphs, to indicate that he understood each point. (Id. at 83.)  The form introduced by the government contains check marks next to each paragraph, and Detective Miller testified that he witnessed Defendant making those

8

marks before the Defendant signed the form.  (Id.)  Defendant does not argue that he

could not understand Detective Miller's offer to read the form to him.[7]

Furthermore, Defendant's actions at the time indicated that he understood his

rights.  Both Agent Gillespie and Detective Miller testified that at 5:30 A.M., twenty

minutes after Defendant had signed the form, he stated that he would not answer their

questions.  (See 9/18 Tr. at 25-26 ("He said that he had nothing to talk to us about.");

9/28 Tr. at 84 ("He had nothing to say at that point.").)  That the Defendant elected to

remain silent after reading the Miranda form is strong evidence that the Defendant

understood the form.  The Defendant was adequately advised of his rights.[8]

**2. Invocation of the Right to Remain Silent**

When Defendant told Agent Gillespie that he had nothing to say to him at 5:30

A.M., the officers did not attempt to question him.  (See 9/28 Tr. at 26 ("We left him and

went on with our investigation.").)  Later that morning, officers obtained a search warrant

for the Lincoln Navigator.  (See Downey Aff.)  In the car they found "[f]our handguns

and 100 bricks of heroin."  (Id. at 22.)  At around 10:30 A.M., Agent Gillespie returned

to the Hudson County Prosecutor's Office and informed Defendant of the result of their

search.  (Id. at 27.)  At this point, Defendant told him that "only one of the handguns was

his inside the vehicle."  (Id.)  Thereafter, he "acknowledged being in Manhattan and

picking up a quantity of heroin."  (Id.)  Defendant contends that the statements should be

suppressed because "[b]y continuing to question Mr. Suarez after he had invoked his

---

[7] At the hearing, the Defendant was offered an interpreter and declined to use one because, as counsel
noted, "he speaks English . . . [and] was born and raised in the United States."  (9/18 Tr. at 2.)  The
Defendant does not argue that he is illiterate.
[8] Though not constitutionally necessary, it is better police practice to advise every defendant of his rights
both orally and in writing where possible.  See Sledge, 546 F.2d at 1122 ("[T]he preferred practice would
include both an oral recitation of the required Miranda warnings coupled with the delivery of a written
explanation thereof to the accused and the request that he execute a legally sufficient waiver prior to the
commencement of custodial interrogation.").

right to remain silent, Agent Gillespie violated Mr. Suarez's constitutionally-protected right to avoid self-incrimination by compelling him to make a statement."  (Def.'s 10/12 Mem. 6.)

In Michigan v. Mosley, 423 U.S. 102 (1975), the Supreme Court addressed the appropriate procedures for law enforcement to follow once a Defendant has invoked his right to remain silent. Though there is no "*per se* proscription of indefinite duration upon . . . further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent," there are limitations on further questioning.  (Id. at 102-03).  According to the Supreme Court, "the admissibility of statements obtained after the person in custody has decided to remain silent depends, under *Miranda,* on whether his 'right to cut off questioning' was 'scrupulously honored.'"  Id. at 104 (quoting Miranda v. Arizona, 384 U.S. 436, 474, 479 (1966)).

In deciding that officers in Mosley had not violated defendant's rights, the Supreme Court noted several factors that led it to such a determination: "the police . . . immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." Mosley, 423 U.S. at 106.  It also noted what practices might have led it to conclude otherwise: "[t]his is not a case . . . where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind."  Id. at 105.

The factors set out by the Court in Mosley are not a strict test for admissibility.
See United States v. Dell'Aria, 811 F.Supp. 837, 843 (E.D.N.Y. 1993) ("[T]he *Mosley*
Court did not intend these factors to be exhaustive, nor did it intend that a finding as to
any one of the enumerated factors would forestall the more general inquiry . . . the courts
must consider all of the circumstances surrounding the conduct of law enforcement
authorities.").  The Second Circuit has upheld the admissibility of statements made to
officers where officers continued questioning a defendant immediately after he told them
he did not wish to speak with them and without giving him a fresh set of warnings.
Wilson v. Henderson, 584 F.2d 1185,  1188 ("The instant case differs factually from
Mosley . . . in that in the latter case[] the interrogation ceased when the defendant[]
declined to speak and did not resume until a period of time had elapsed and renewed
warnings were given."); but see Dell'Aria, 811 F.Supp. at 843 ("Since *Wilson*, the
Second Circuit has often deemed violative of *Mosley* interrogations that followed closely
on the heels of a defendant's invocation of the right to silence.").

     The facts of this case fall somewhere between the two poles laid out by the
Supreme Court in Mosley.  As in Mosley, here the officers immediately ceased
questioning Defendant as soon as he told them he did not wish to make a statement.
Approximately five hours elapsed before they spoke to him again.  Defendant does not
contend that they refused to discontinue interrogation at any point, or persisted in
repeated efforts to wear down Defendant's resistance.  Agent Gillespie's statements to
Defendant that they had found guns and drugs in the Lincoln, however, clearly referred to
the same crime for which Defendant had been arrested earlier that day. Nor did Agent
Gillespie give Defendant a fresh set of Miranda warnings before speaking with him

again.  However, the record shows that when Agent Gillespie informed Defendant of the

results of the search of the Lincoln Navigator, and before any interrogation of Defendant,

Defendant stated that "only one of the guns was his" and then, evidently in response to

questions, acknowledged being in Manhattan and picking up a quantity of heroin. (9/18

Tr. at 27.)

   The issue presented by this case arises out of circumstances similar to a case

decided by the Second Circuit the year before the Supreme Court decided Mosley.  In

United States v. Boston, 508 F.2d 1171 (2d Cir. 1974), a defendant refused to sign a

waiver of his rights, claiming he was innocent.  Id. at 1175.  Subsequently officers

obtained a warrant and searched the defendant's sister's home, where they found

incriminating evidence: "[t[he results of the search were relayed to [the suspect] who then

admitted his participation in the robbery."  Id.  Upholding the admission of the statement,

even though the defendant had initially refused to waive his right to silence, the court

reasoned that "[the defendant] knew his *Miranda* rights and exercised them until he was

confronted with the results of the search of his apartment."  Id. at 1175; but see Anderson

v. Smith, 751 F.2d 96, 104 (2d Cir. 1984) (questioning the viability of Boston after the

Supreme Court's decision in Rhode Island v. Innis, 446 U.S. 289 (1980), but not

overruling it).[9]

---

[9] In Innis, the Court stated that any "interrogation" after a defendant had requested a lawyer was
unconstitutional unless it was "normally attendant to arrest and custody."  Innis, 446 U.S. at 300.  In
Anderson, the Second Circuit noted that "[O]nly the Ninth Circuit has expressly tried to square the holding
of cases . . . suggesting that it is 'normally attendant to arrest and custody' for the police to present the
accused with evidence against him."  Anderson, 751 F.2d at 104.  Though suggesting that Innis weakened
the reasoning in Boston, the court did not overrule the latter case.  Both Anderson and Innis dealt with a
suspect's invocation of the right to a lawyer, and "[p]olice interrogation is more severely restricted after the
suspect asserts his right to counsel than after he asserts his right to silence."  Anderson, 751 F.2d at 101.
Thus, the applicability of Innis to this case is not clear under the current law in this circuit.

The situation here is most analogous, on the facts, to the circumstances in <u>Boston</u>. Initially Defendant determined not to speak with officers, and they did not interrogate him.  Upon being presented with the results of the search of the Lincoln, however, he chose to make an inculpatory statement about one of the guns, causing the agents to elicit his acknowledgment that he had gone to Manhattan on March 5 to pick up the heroin. There is nothing on the record or in the Defendant's affidavit which casts doubt on Agent Gillespie's testimony that Defendant made a voluntary choice to respond to the results of the search.  In his supporting affidavit, Defendant does not claim that his statements were coerced, nor is there any evidence to show that his statements were the product of coercion by officers.  Defendant does claim that the officer's guns were visible during the interrogation. (Def.'s Aff. ¶ 11), but he does not state that the officers' guns were drawn, or that he made his admissions because the guns were visible.  He did not assert that he was in any way affected by the visibility of the guns.  He also claims, in his supporting affidavit, that he had no food or drink in the hours before he was questioned, (<u>id.</u> ¶ 9), but does not state that their absence was the cause of his admissions.  On the record before this Court, Defendant's statements to agents were "the product of a free and deliberate choice rather than intimidation, coercion or deception." <u>Moran v. Burbine</u>, 475 U.S. 412 (1986).  Therefore, the statements are admissible.

CONCLUSION

The government has met is burden on both probable cause for arrest and proper

Miranda procedures.  Therefore, Defendant's motion is denied.

IT IS SO ORDERED.

Dated:  New York, New York
        December 7 , 2006

                                        Robert P. Patterson, Jr.
                                              U.S.D.J.

**Copies of this Opinion and Order sent to:**

Michael J. Garcia, U.S. Attorney
Southern District of New York
ATTN:  Elie Honig, A.U.S.A.
One St. Andrew's Plaza
New York, NY 10007
Tel:    212-637-2474
Fax:    212-637-2241


*Counsel for Manuel Suarez*

Jesse Siegel
Law Office of Jesse M. Siegel
251 East 61st Street
New York, NY 10021
Tel:    212-207-9009
Fax:    212-486-7701

14